**In re PNEUMATIC TUBE STEAM SPLICER CO.**

No. 6655.

District Court, D. Maryland.

June 2, 1932.

Willis R. Jones, of Baltimore, Md., for Steam Splicer Co., A. R. L. Dohme, and John J. Batterman.

Weinberg & Sweeten, of Baltimore, Md., for petitioners.

WILLIAM C. COLEMAN, District Judge.

The questions for determination arise upon the petition of several creditors and stockholders of the bankrupt company, manufacturer and seller of automobile tube vulcanizers and splicers, which was filed five weeks after the adjudication (upon a voluntary petition), and ten days after the assets of the company were sold and the sale ratified, in accordance with the requirements of the Bankruptcy Act (11 USCA § 1 et seq.), and the assets partially, if not entirely, reduced to the possession of the vendee.

Summarized, the petition seeks (1) a reopening of the original proceedings, and vacating of the adjudication of the company as a bankrupt; (2) rescinding the sale of its assets; and (3) disallowance of a claim of $22,314.39 filed by A. R. L. Dohme, president and director of the company and owner of the greater portion of its stock. The basis alleged for all of this relief is that the adjudication, sale of the assets, and the claim of A. R. L. Dohme are a fraud upon the creditors and stockholders of the company, and, more specifically, that the bankruptcy proceeding was instituted ostensibly by the company acting through its board of directors but really by A. R. L. Dohme and his brother-in-law, John J. Batterman, a director, and purchaser of the company's assets, who controlled and dominated the board through their relatives and office employees, for the personal benefit and advantage of Dr. Dohme and Mr. Batterman by means of the valuable patents, machinery, equipment, and good will of the company, and that therefore what was done by the board of directors and by Dr. Dohme and Mr. Batterman was in derogation of the rights and best interests of the petitioning stockholders and creditors, and others for whom they claimed to have filed the petition in a representative capacity.

The corporation, Dr. Dohme, and Mr. Batterman answered the petition, denying categorically the various allegations that their action had been improper in any way. Considerable testimony was taken and extensive arguments heard. As a result, the court reaches the conclusion that the petitioners have failed to meet the burden which rests upon them, to prove that they are entitled to the relief for which they ask.

First, as to the adjudication, we fail to find that there was anything unlawful or irregular in the method by which it was brought about. It is a well-settled principle that a creditor may not challenge the right of a corporation's board of directors to file a petition in bankruptcy on behalf of the company. In re Guanacevi Tunnel Co., 201 F. 316 (C. C. A. 2d) ; In re United Grocery (D. C.) 239 F. 1016. Also it is equally well settled that a corporation's board of directors has the power to place the corporation in bankruptcy by voluntary petition without submitting the matter to a vote of the stockholders. In re Lone Star Shipbuilding Co. (C. C. A.) 6 F.(2d) 192 (where the corporation was chartered in Maryland) ; In re De Camp Glass Casket Co. (C. C. A.) 272 F. 558 ; In re Nonpareil Consolidated Copper Co. (C. C. A.) 227 F. 575. Nor does the fact that a member of the board of directors owns virtually all of the corporation's stock make any difference. In re Pacific Motor

Car Co. (C. C. A.) 225 F. 750. We find nothing in the charter or by-laws of the Pneumatic Tube Steam Splicer Company, which was incorporated under the laws of Maryland, creating an exception to the aforegoing principle. There is no statutory provision in the Maryland corporation law contrary thereto. Article 23, §§ 10 (as amended by Acts Md. 1927, c. 581, § 1) and 13 of the Maryland Annotated Code define the power of the directors. Sections 36 and 88 of the same article cover the dissolution and sale of the corporation's property as a whole; and, while they require in such cases the consent of two-thirds of the stockholders, they are not to be taken as in derogation of the right on the part of the directors, by their own vote, without more, to place the corporation in bankruptcy. See In re United Grocery Company; In re De Camp Glass Casket Co. and In re Nonpareil Consolidated Copper Company, supra. In the present case, the resolution of the board is in proper form, and was legally adopted.

Turning to the second claim made by the petitioning creditors and stockholders, namely, that the sale of the entire assets of the corporation by the trustee in bankruptcy to John J. Batterman, should be rescinded because in effect fraudulent, there is an absence of proof that such is the case. There was no irregularity, nor indeed is any alleged, with respect to the formalities surrounding the sale and its ratification by the referee. By the Bankruptcy Act and by the order of this court, the referee had power to advertise the property for disposal at either public or private sale, to conduct such a sale, to accept the highest offer, and to ratify and confirm a sale to the person submitting the same, provided that the notice required by the Bankruptcy Act, to all creditors, of both the proposed sale and proposed ratification of the accepted offer, was duly given. We find that all of these formalities were properly complied with. Nevertheless, the petitioners still contend that the price obtained for the corporation's assets, to wit, $12,000, is so inadequate as to be in fraud of themselves and other creditors and stockholders similarly situated, and that, if the sale is rescinded and the property required to be again offered for sale, it should and will, in their estimation, bring a far more adequate price.

We do not, however, find that the evidence supports this contention. The petition sets forth that the appraisal of the machinery, equipment, and patents of the company, placed at $11,857.75, is far below their actual value; that petitioners are prepared to show not only that the machinery and equipment owned and used by the company is worth considerably more than the value set forth in the schedules of assets filed by the petitioner, namely, approximately $7,100, but that the patents issued and pending, owned by the company, are among the most important and valuable in the rubber tire industry; that the machinery manufactured under these patents has been and still is used by virtually all of the principal manufacturers of rubber automobile tubes in the United States and other countries; and that through the use of these patents the corporation has, in the last ten years, made large profits and paid large dividends to its stockholders. The testimony adduced, however, satisfies us that, while the patents owned by the corporation were originally important and valuable in the industry, their importance and value has, in the last few years, been greatly diminished by reason of the sale of shop rights in these patents; by competition, development of the prior art, great decline in the price of automobile tires and tubes, the general business depression, and to a number of other circumstances arising in the trade. Indeed, for a considerable time prior to the filing of the petition in bankruptcy, the corporation had been operated at a loss, albeit during seven years, 1923 to 1929, inclusive, the company had paid in dividends the large sum of nearly $650,000.

In the sworn schedule of assets, the value of the various patents is stated as "not determinable," but a notation is made that "there is some value to the patents." The net value, taken from the books of the company, of the patents and good will, that is, $138,486.69, is merely referred to in the inventory, but not adopted. Similarly, the appraisers in their report declined to place any value on the patents as such, stating that the $7,000 value which they placed in their report upon the 2,200 machines under leases on a royalty basis included such value as they were, at the time, able to place upon the patents.

It may be that, had appraisers been selected who were more conversant with the particular art, and if the sale of the patents had been advertised in various technical journals devoted to that art, more and higher bids might have been obtained. In fact, such practice, especially where patents are involved, is recommended. However, the evidence discloses that both the trustee and the referee made reasonable, honest efforts to

obtain the best possible price for all of the assets, and that Mr. Batterman's offer—the only one obtained—was not accepted until they were satisfied that it was futile to withdraw the property, and make further attempts to dispose of it at a higher figure. It is significant that the petitioners, while protesting against the sale, do not represent to the court that they have any definite assurance that a higher bid will in fact be forthcoming, if the sale is rescinded and the property again offered for sale. Indeed, the most that any of the witnesses for the petitioners have asserted is that they feel the price obtained is inordinately low, in view of the alleged intrinsic value of the patents, and the earlier record of the company. However, this is not enough to justify a court in upsetting a sale that has been otherwise regular; certainly not where the sale has been ratified and the vendee given possession of property which he acquired in entire good faith.

The testimony covering the value of the patents upon which the petitioners would have the court largely rely as a basis for rescinding the sale, namely, the testimony of Mr. Seward, consulting engineer employed by the company and now a creditor for unpaid fees as a result of professional services rendered to the company, is based upon values which prima facie appear to be so inflated as not to command reliance. For example, Mr. Seward testified that the three principal patents are worth, in his opinion, an aggregate of $1,250,000. He stated that, if properly promoted, one of these patents should yield an annual income of $50,000, another of $20,000 or $25,000, and the third, of $100,000. But this is mere opinion testimony, unsupported by convincing figures, and in fact contradicted by the company's record, the state of the art, and present conditions in the particular industry.

Nothing should be done to weaken confidence in the stability of judicial sales. There must be some real cause before they will be upset. Inadequacy of price alone is rarely sufficient—that is, there must be proven gross inadequacy, or circumstances from which palpable mistake or fraud is to be inferred. The order provided that the property should not be sold for less than 75 per cent. of its appraised value. Here the appraised value was slightly exceeded. Were the court to rescind the sale and order another, there is no assurance whatever that the property could then be disposed of at all. Certainly, under these circumstances, the court would not be justified in depriving

a bona fide purchaser of his rights. Ballentyne v. Smith, 205 U. S. 285, 27 S. Ct. 527, 51 L. Ed. 803; Speers Sand & Clay Works v. American Trust Co. (C. C. A.) 52 F.(2d) 831; In re Burr Mfg. & Supply Co. (C. C. A.) 217 F. 16. It may be assumed, without deciding, that, were the representations made to the court not merely of a vague and speculative nature, but in the form of an actual offer to pay substantially more for the property, the situation might be different.

Lastly, as to the third assertion of the petitioners, namely, that the claim of Dr. Dohme should be disallowed, we also find that there is no merit in this contention. This claim is represented by a demand note, which was duly executed by the company, in payment of a bona fide obligation; it was pledged to an associate company as collateral security for the sum of $20,000, and Dr. Dohme acquired it by paying this amount to the associate company. The remaining equity in the note was acquired by Dr. Dohme under a valid assignment by the payee. He appears to have paid full value for the note, and therefore we find nothing irregular in his claim upon it, against the bankrupt corporation.

There is a great deal in the pleadings and in the testimony regarding rather involved manipulations of the stock of the bankrupt company, and of the interrelated companies, in all of which Dr. Dohme and Mr. Batterman held the controlling interest. However, it seems unnecessary to go into a detailed analysis of this phase of the case, because we fail to find that anything was done by these persons which entitles the petitioners to the relief asked. Their dominating influence throughout the short and rather meteoric history of the bankrupt company is beyond question, but there is no proof of fraud in their conduct; they lost heavily along with the other stockholders. The business may have been inefficiently conducted. But that is not of consequence in the present inquiry, in the absence of fraud or willful negligence. The fact that Mr. Batterman was so intimately connected with the company and with Dr. Dohme is not, of course, sufficient to create an inference of bad faith on his part, and, in the absence of same, or of some proven mistake or irregularity, there appears to be no justification for upsetting what has been done, the formalities of the Bankruptcy Act having been complied with throughout the various successive stages.

Accordingly, the petition must be dismissed.